In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3903

Tempel Steel Corporation,

Plaintiff-Appellee,

v.

Landstar Inway, Inc.,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 6839--Suzanne B. Conlon, Judge.


Argued April 10, 2000--Decided May 2, 2000


   Before Easterbrook, Kanne, and Rovner, Circuit Judges.

   Easterbrook, Circuit Judge.   En route from
Minster, Ohio, to Monterrey, Mexico, a large
machine press was severely damaged. A motor
carrier had not secured the press properly and
drove too fast; this combination led to the loss,
which cost almost $300,000 to fix. Tempel Steel,
the owner, wants Landstar Inway, its carrier, to
reimburse it for repair costs, and the district
court granted summary judgment in Tempel's favor
under the Carmack Amendment to the Interstate
Commerce Act, 49 U.S.C. sec.14706. See 1999 U.S.
Dist. Lexis 11018 (N.D. Ill. 1999). But Landstar
insists that it is not liable: a tariff disclaims
all liability for casualties in Mexico, where the
accident occurred, and anyway, Landstar insists,
the loss was the fault of Teresa de Jesus Ortiz
Obregon, a drayage company that Parker & Co., a
customs broker, hired to move the cargo through
U.S. and Mexican customs facilities before
delivery to the Mexican interchange carrier.

   A motor carrier must compensate

the person entitled to recover under the
receipt or bill of lading. The liability
imposed under this paragraph is for the
actual loss or injury to the property
caused by (A) the receiving carrier, (B)
the delivering carrier, or (C) another
carrier over whose line or route the

property is transported in the United
States or from a place in the United
States to a place in an adjacent foreign
country when transported under a through
bill of lading[.]

49 U.S.C. sec.14706(a)(1). Mexico is an adjacent
foreign country; Landstar issued a through bill
of lading; and Tempel is "the person entitled to
recover under the . . . bill of lading." That the
drayage company is "another carrier over whose
line or route the property is transported" does
not relieve Landstar of its liability. Having
issued a through bill of lading (and touted its
"seamless" service), Landstar is responsible for
the entire movement. A shipper may look to its
chosen carrier, which then bears the
responsibility for seeking compensation from
another carrier actually responsible for the
loss. (Landstar's arrangement with its Mexican
counterpart provides expressly for this; the
originating carrier handles all loss, damage, and
delay claims.) A straightforward application of
the Carmack Amendment supports the district
court's decision. If Landstar feared that Parker
would use a feckless drayage company, it could
have issued two bills of lading: one from Minster
to U.S. customs, and the other from Mexican
customs to Monterrey. But it did not do this and
is liable for damage caused by intermediate
carriers, no matter who selected them, under
sec.14706(a)(1)(C).

  Nonetheless, Landstar insists, the court should
have applied its tariff in lieu of the Carmack
Amendment. The bill of lading recites that the
press was received "subject to the
classifications and tariffs in effect on the date
of the issue of this Bill of Lading." In December
1997, when it picked up the machine, Landstar
maintained (apparently in its own files) a
document containing this provision:

Carrier's transportation service to Mexico
shall end at the border point when carrier
delivers the shipment to a designated
interline carrier. . . . At no time shall
Carrier be held liable for any loss or
damage to a shipment within the country of
Mexico.

We doubt that this was a "tariff in effect" in
1997. Until 1995 tariffs had legal effect; the
filed-rate doctrine made it impossible for
shippers and carriers to contract around them.
American Telephone & Telegraph Co. v. Central
Office Telephone, Inc., 524 U.S. 214 (1998);
Square D Co. v. Niagara Frontier Tariff Bureau,
Inc., 476 U.S. 409 (1986). The ICC Termination
Act, 109 Stat. 803 (1995), abolished the tariff

filing requirement and the filed-rate doctrine, and it canceled the legal effectiveness of most extant tariffs. 49 U.S.C. sec.13710(a)(4). See Munitions Carriers Conference, Inc. v. United States, 147 F.3d 1027, 1029-30 (D.C. Cir. 1998). Today carriers adopt standard contractual terms, which some call "tariffs" out of habit, but which have no effect apart from their status as contracts. Landstar's bill of lading probably should have been revised to say that it incorporates "standard terms" rather than "tariffs in effect"; had it done this, Landstar could have avoided Tempel's argument that no tariff is "in effect" today and that Landstar's therefore should be ignored. But it is clear what the bill of lading was getting at, so we read its language as incorporating off-the-rack terms.

Landstar should have written a better set of terms, because its document does not achieve the desired goal. Aping language from the Cretaceous period, this document recites that it governs "only in connection with tariffs making reference to the ICC number hereof." This is a mismatch for modern motor transit. No other tariff makes "reference to the ICC number hereof" (indeed, the ICC no longer exists), and if we read the contract between Tempel and Landstar as the functional equivalent to a rate tariff, again there is no reference to Landstar's rules tariff, by number or any other identifier. Tempel would not have had any reason to track down Landstar's standard terms, and it has long been established--quite apart from the language of Landstar's "tariff"-- that actual notice is necessary for a limitation of liability to be enforced. Hughes v. United Van Lines, Inc., 829 F.2d 1407, 1419-20 (7th Cir. 1987). Landstar believes that Hughes should be limited to situations in which the shippers are amateurs (in Hughes, the shipper contracted for the movement of household goods), while businesses such as Tempel should be satisfied with constructive notice. Subsection (f) of the Carmack Amendment establishes one special rule for shippers of household goods, but neither this subsection nor any other language in the statute (or any regulation we could find) requires businesses to scrounge for limitations that have not been flagged by the carrier. Before the 1995 amendments, provisions in tariffs usually governed whether shippers had actual, constructive, or no notice; that's what the filed-rate doctrine meant. Landstar cites several cases from the filed-rate-doctrine era. But with that doctrine defunct for motor transport, it is hard to envisage how a shipper can be said to agree to a limitation of liability of which it lacked actual knowledge.

Let us suppose, however, that this is wrong,

and that shippers sometimes must snoop around to see what a carrier's files may contain. Had it investigated, Tempel might have found the disclaimer of liability. That disclaimer would not have availed Landstar; motor carriers can't just cancel the Carmack Amendment by their say-so. Doubtless everyone would like to override federal statutes on occasion, but matters are not that simple. Subsection (c)(1)(A) of the Carmack Amendment provides a means for carriers to limit their liability, but it is not a means that Landstar attempted to use. A motor carrier may "establish rates for the transportation of property (other than household goods described in section 13102(10)(A)) under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." Carriers using this approach may set out schedules of values and prices, with higher charges for the transportation of more valuable cargo. Our opinion in Hughes discusses at length the process of establishing valuation and value-specific rates. 829 F.2d at 1416-23. What carriers may not do is simply declare that they have no liability--for a value of $0 rarely will be "reasonable under the circumstances surrounding the transportation."

Landstar says that Tempel was an experienced shipper that could have consulted the tariffs; yet Landstar, as an experienced carrier, should have realized that its "tariff" was ineffectual for transit under a through bill of lading. Landstar had every right to issue a bill of lading that stopped at the U.S. border. Instead it entered into a competitive process, under which Tempel had invited carriers to bid for through transport of goods from Ohio to Mexico. Having agreed to through transport in order to obtain the business, and having failed to offer Tempel a price schedule that linked rates to liability for loss, Landstar must accept the legal consequences under sec.14706.

Affirmed